UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

SARAH E. BIEGEL,               )
                                   )
Plaintiff,                   )
                                   )
v.                            )
                                   )     Case No. 2:17-CV-40-SPM
     )
     )
     )
NANCY A. BERRYHILL,     )
Deputy Commissioner of Operations,     )
Social Security Administration,     )
     )
Defendant.     )

## <u>MEMORANDUM OPINION</u>

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Defendant Nancy A. Berryhill, Deputy Commissioner for Operations, Social Security

Administration (the "Commissioner") denying the application of Plaintiff Sarah E. Biegel

("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned

magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 9). Because I find the decision denying

benefits was not supported by substantial evidence, I will reverse the Commissioner's denial of

Plaintiff's application and remand the case for further proceedings.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

On or around July 14, 2014, Plaintiff applied for SSI, alleging that she had been unable to

work since January 19, 2013. (Tr. 335-39). Her application was initially denied. (Tr. 280-84).

Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 289-99). After a hearing, the ALJ issued an unfavorable decision on April 11, 2016. (Tr. 47-61). On May 23, 2016, Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council. (Tr. 334). On May 17, 2017, the Appeals Council declined to review the case. (Tr. 1-7). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

At the hearing before the ALJ, held on January 26, 2016, Plaintiff testified as follows. Plaintiff asserts that she is unable to work due to bipolar disorder, anxiety, depression, PTSD, borderline personality disorder, fibromyalgia, trouble sleeping, pain, panic attacks, knee problems, lack of patience, and arthritis in her back. (Tr. 78-79). Plaintiff testified that her fibromyalgia affects her ability to work because if she sits too long, it feels like her tailbone is crumbling. (Tr. 82). She testified that she cannot walk for too long, because her back muscles tense up. (Tr. 82). She testified that she had knee surgery and that she is waiting for a donor knee. (Tr. 82-83). She testified that she can stand about ten minutes at a time to do the dishes before her back starts hurting, but that her knees would be fine. (Tr. 84). She lies down about four hours out of the day because of pain. (Tr. 98). She spends the whole week in her room about once a month. (Tr. 99). She has crying spells about three days out of the month, typically lasting two hours. (Tr. 100). She has panic attacks two days out of the week, typically one per day, in which it feels like someone is sitting on her chest. (Tr. 100). The attacks last for 15 to 30 minutes. (Tr. 101). She still experiences suicidal thoughts. (Tr. 102). She is snappy and does not get along with people. (Tr. 87).

Plaintiff takes methocarbamol and Voltaren gel for her back and tramadol for her knees. (Tr. 95-97). She testified that she does not take medicine for fibromyalgia, because she tried

medication and it did not work.(Tr. 79-80). Plaintiff sees a doctor, a counselor, and a case worker for her mental health problems. (Tr. 85). She also takes several medications for her mental impairments, and they are helping "for the most part." (Tr. 86).

During much of the time frame relevant to her claim, Plaintiff was living with a boyfriend, who had three children (aged 12, 8, and 4 at the time of the hearing) who sometimes lived with them. (Tr. 74-76). She testified that her role was to "try to keep up the house," but that he did the cooking, laundry, and grocery shopping. (Tr. 75). It takes her a couple of hours to clean five small rooms because she has to take breaks every 15 minutes to sit down for 20 minutes. (Tr. 107). She gets so worn out from doing a little bit of housework that she has to lie in bed for a day or two. (Tr. 107). She also watched the youngest when he got home from a half-day school program, which she found stressful. (Tr. 76). She also stated that she watched the three kids (and sometimes another seven-year-old) to keep her busy, so she would not get depressed. (Tr. 90-91). The children mostly played with electronics while she stayed in her room with the door open in case something happened. (Tr. 99-100).

With respect to Plaintiff's medical records, the Court accepts the facts as set forth in the parties' statements of fact and responses. The Court will address specific records relevant to the parties' arguments in the discussion below.

## II. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if he is, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore*

*v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 416.920(e) & 416.945(a)(1). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(v), 416.920(g); *McCoy*, 648 F.3d at 611.

### III. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since June 26, 2014, the application date; that Plaintiff had the severe impairments of major depressive disorder, borderline personality disorder, lumbar degenerative disc disease, fibromyalgia, and diabetes mellitus; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 52-53). The ALJ found that Plaintiff had the following RFC:

> [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 416.967(b) except she cannot stand more than 4 hours in a workday. She can perform bilateral foot controls no more than occasionally. She can never climb ladders, ropes or scaffolds or kneel. She can occasionally balance, stoop, crouch and crawl. She is limited to work that is simple, routine, and repetitive tasks; in a work environment free of fast paced quota requirements; involving only simple work related decisions with few if any, work place changes and involving no interaction with the public and only occasional interaction with coworkers.

(Tr. 64). The ALJ found that Plaintiff had no past relevant work. (Tr. 60). However, after hearing testimony from a vocational expert, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including assembler, fold machine operator, add clerk, and document preparer. (Tr. 60-61).

IV. DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds: (1) that the ALJ erred in his evaluation of the opinions of Plaintiff's treating physicians; and (2) that the RFC is not supported by substantial evidence.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's

decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Evaluation of the Opinion Evidence

Plaintiff first argues that the ALJ erred in his evaluation of the medical opinion evidence, in that he failed to accord adequate weight to the opinion of treating physician Dr. Adam J. Samaritoni regarding Plaintiff's physical limitations and failed to accord adequate weight to the opinion of treating physician Dr. David Goldman regarding Plaintiff's mental limitations.

Under the regulations applicable to Plaintiff's claim, if the Social Security Administration finds that a treating source's medical opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Social Security Administration will give that opinion "controlling weight." 20 C.F.R. § 416.927(c)(2).[1] *See also Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) ("A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.") (internal quotation marks omitted). However, a treating physician's opinion is not inherently entitled to controlling weight. *See Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments

---

[1] These regulations apply to claims filed before March 27, 2017. For claims filed after March 27, 2017, the rule that a treating source opinion is entitled to controlling weight has been eliminated. *See* 20 C.F.R. § 416.920c(a). Throughout this opinion, the Court will refer to the version of the regulations that applies to claims filed before March 27, 2017.

are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Goff*, 421 F.3d at 790 (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). The ALJ may also "discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). Where the ALJ does not give a treating physician's opinion controlling weight, the ALJ must evaluate the opinion based on several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. § 416.927(c)(2)-(6). "When an ALJ discounts a treating physician's opinion, [the ALJ] should give good reasons for doing so." *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir.2007)). It is the ALJ's duty to resolve conflicts in the evidence, and the ALJ's assessment of the opinion evidence should not be disturbed so long as it falls within the "available zone of choice." *See Hacker*, 459 F.3d at 937-938.

The Court will consider each of the relevant opinions in turn.

### 1. Dr. Adam Samaritoni's Opinion

On November 10, 2015, Dr. Samaritoni completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form for Plaintiff. (Tr. 718-21). He opined that Plaintiff could lift and carry ten pounds frequently or occasionally, could stand and walk (with normal breaks) about three hours out of an eight-hour day; could sit for less than two hours in an eight-hour day; could sit for 30 minutes and stand for 60 minutes before changing positions; must walk around five times in an eight-hour day for ten minutes at a time; needed the opportunity to shift at

will from sitting or standing/walking; would need to lie down at unpredictable intervals during an eight-hour working shift; could never crouch, climb stairs, or climb ladders; and could occasionally push/pull. (Tr. 718-19). When asked what medical findings supported those limitations, he wrote, "Based on patient history." (Tr. 718-19). Dr. Samaritoni also opined that Plaintiff could not do any kneeling because of knee pain. (Tr. 720). He opined that Plaintiff's impairments or treatments would cause her to be absent from work more than four days per month, and that she would likely be off-task 25% or more of the work day. (Tr. 720). He also opined that she would need to take unscheduled breaks about five times during the work day, for ten minutes each, because of pain/paresthesias and numbness. (Tr. 721).

The ALJ discussed Dr. Samaritoni's opinion in detail in his decision. (Tr. 57, 59). However, he gave "no weight" to the opinion, reasoning that Dr. Samaritoni "indicated that he based these limitations on the claimant's history and there was no mention on basing these limitations on the claimant's current functioning." (Tr. 59). Plaintiff argues that the ALJ failed to give appropriate weight to the opinion and failed to consider the relevant factors in evaluating it. Plaintiff also argues that if the ALJ had questions regarding Dr. Samaritoni's findings, he should have re-contacted Dr. Samaritoni to resolve those questions.

Upon review of the ALJ's decision, Dr. Samaritoni's opinion, and the record as a whole, the Court finds that the ALJ did not conduct an adequate assessment of Dr. Samaritoni's opinion under the regulations and did not offer good reasons for his decision to discount it completely. It does not appear that the ALJ conducted any analysis of whether Dr. Samaritoni's opinions were consistent with his own treatment notes, the treatment notes of Plaintiff's other physicians, or the objective findings in the record. It also does not appear that the ALJ analyzed the nature and extent of the treatment relationship between Dr. Samaritoni and Plaintiff. The ALJ also did not discount

the opinion of Dr. Samaritoni because he found that some other medical opinion was more consistent with the record than was Dr. Samaritoni's opinion. Indeed, as discussed below, there is no other medical opinion evidence in the record regarding Plaintiff's physical functioning, and it is not at all clear what evidence *did* support the ALJ's findings with regard to Plaintiff's physical functional limitations.

The only reason the ALJ gave for discrediting Dr. Samaritoni's opinion in its entirety was Dr. Samaritoni's note on the form that the limitations were based on "patient history," which the ALJ apparently interpreted as meaning that the opinions related to claimant's past functioning rather than her current functioning. A review of the hearing transcript suggests that the ALJ may also have believed that Dr. Samaritoni's opinions were based solely or primarily on Plaintiff's answers to Dr. Samaritoni's questions.[2] The Court is skeptical of the ALJ's apparent conclusion that a treating doctor's note that his opinions are based on "patient history" constitutes an

---

[2] At the hearing, Plaintiff's testimony suggests that Dr. Samaritoni's opinions may have been based in part on the answers Plaintiff gave to questions posed by Dr. Samaritoni, although that evidence does not make it at all clear that the opinions were entirely based on such answers. The ALJ and Plaintiff had the following exchange regarding the opinion:

> Q.    Okay. And he filled out a, what I call a medical source statement of what you can do, what you can't do. Do you remember talking with him about it?
> A.    Yeah.
> Q.    And how'd that go? Tell me what happened?
> A.    Nothing. He just asked me questions. And I, I mean I answered them.
> Q.    So, like, maximum ability to lift and carry on an occasional basis, he asked you. And he's marked 10 pounds. He can mark 10, 20, 50. I mean did he ask you how much you can lift?
> A.    Yeah.
> Q.    Okay. And there's another question about how much your ability to stand and walk during an eight-hour day, about three hours is checked. So is, was, it, he's, like, what should I put down here or —how'd the conversation go?
> A.    I'm not sure, because that was a while ago.

(Tr. 93).

indication that those opinions were based solely on the patient's past functioning or the patient's subjective reports. Dr. Samaritoni treated Plaintiff on several occasions, beginning over a year before he completed the form. (Tr. 677-701). Additionally, reports from at least some of the other treatment providers were sent to Dr. Samaritoni for his review; those include the records of Dr. Chad Ronholm, who treated Plaintiff for back pain and fibromyalgia. (Tr. 1006, 1010, 1015, 1018, 1022, 1027, 1039). Given Dr. Samaritoni's personal knowledge of Plaintiff's condition, obtained through his own treatment of her, and his familiarity with the treatment records from at least some of her other treatment providers, the fact that he wrote "patient history" on the form is insufficient to support the conclusion that his opinion was not based (at least in significant part) on his own knowledge of Plaintiff's medical conditions and current level of functioning. The Court also notes that Plaintiff's attorney stated to the ALJ at the hearing that Dr. Samaritoni includes a similar notation on every medical source statement form he fills out. (Tr. 94-95). Particularly in light of the absence of indication that the ALJ considered any of the other relevant factors in evaluating Dr. Samaritoni's opinion, the Court does not find this to be a sufficient reason for discounting that opinion in its entirety.

For all of the above reasons, the Court finds that the ALJ did not perform an adequate analysis of Dr. Samaritoni's opinion in light of the factors discussed in 20 C.F.R. § 416.927(c) and did not give "good reasons," supported by the record, for disregarding that opinion in its entirety. Thus, remand is required. *See Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); *Clover v. Astrue*, No. 4:07CV574–DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand."); 20 C.F.R. § 416.927(c)(2) ("When

we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). On remand, the ALJ should re-evaluate Dr. Samaritoni's opinions in light of all of the relevant factors. If he believes that it is unclear what the basis was for Dr. Samaritoni's opinions, he should re-contact Dr. Samaritoni for further information regarding the basis for those opinions.

### 2. *Dr. David Goldman's Opinion*

On January 27, 2016, Dr. David Goldman, D.O., Plaintiff's treating psychiatrist, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff. (Tr. 1055-57). Dr. Goldman opined that Plaintiff had marked limitations in the ability to understand, remember, and carry out simple instructions; extreme limitations in the ability to make judgments on simple work-related decisions; extreme limitations in the ability to understand, remember, and carry out complex instructions; and extreme limitations in the ability to make judgments on complex work-related decisions. (Tr. 1055-56). Dr. Goldman noted that due to Plaintiff's bipolar disorder and post-traumatic stress disorder, she experiences mood fluctuations with outbursts of irritability and anger, episodes of loss of focus, and episodes of dissociation, causing Plaintiff to lose track of where she is, what she is doing, and memory disruption. Dr. Goldman also opined that Plaintiff had extreme limitations in the ability to interact appropriately with the public, supervisors, and coworkers, and had extreme limitations in the ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 1056). He stated that due to her bipolar disorder and post-traumatic stress disorder, she becomes easily upset, irritable, and

angry; seeks to withdraw from others; becomes fearful in crowds or groups; feels attacked by criticism, even constructive criticism, causing her to become defensive and withdrawn; and is unable to interact with others without becoming upset. (Tr. 1056). Dr. Goldman also stated that Plaintiff feels on edge most of the time, feeling cautious, fearful, and withdrawn; that she has difficulty with focus and concentration and being easily distracted; that she is easily and quickly overwhelmed when confronted with interacting with others; and that she experiences "ease to anger, irritability, and emotional outbursts that cause her to withdraw from others." (Tr. 1056). He stated that her impairments are likely to produce good days and bad days and that she is likely to be absent from work more than four days per month. (Tr. 1057). He also found that she will likely be off-task 25% or more of the day and will need to take unscheduled breaks three to four times per hour for ten minutes of more, due to panic attacks; crying spells; anxiety; and episodes of irritability, anger, and frustration. (Tr. 1057).

After discussing this opinion, the ALJ gave it "little weight," stating that it was "simply not consistent with the treatment notes." (Tr. 59). The ALJ instead gave "great weight" to the state agency mental assessment performed by Stanley Hutson, Ph.D., who reviewed Plaintiff's records on October 3, 2014, and found that Plaintiff had at most moderate limitations in the areas of mental functioning he assessed. (Tr. 267-74).

Upon review of the record, the Court finds that the ALJ properly considered Dr. Goldman's opinion and gave a good reason for discounting it. The Court first notes that the ALJ discussed Dr. Goldman's opinion in detail and did incorporate some of the limitations in the opinion in the RFC. (Tr. 54, 58-59). The ALJ limited Plaintiff to work involving no interaction with the public and only occasional interaction with coworkers, which at least partially accounts for Dr. Goldman's finding that she had limitations in the ability to interact appropriately with the public and with

coworkers, as well as his opinion that that she has a tendency to become upset, irritable, angry, defensive, and withdrawn and that she becomes fearful in crowds or groups. The ALJ also limited Plaintiff to simple, routine, and repetitive tasks; to a work-environment free of fast-paced quota requirements; and to work involving only simple work-related decisions and few workplace changes. These limitations at least partially account for Dr. Goldman's opinion that Plaintiff has limitations in the ability to make judgments on work-related decisions; limitations in the ability to understand, remember, and carry out instructions; and difficulty with focus and concentration.

To the extent that the ALJ did not adopt Dr. Goldman's decisions because they were inconsistent with the treatment notes, that decision is supported by the record. A review of Dr. Goldman's own treatment notes shows that they are inconsistent with, and do not support, the extreme limitations in nearly every area of mental functioning that he included in his opinion. Dr. Goldman's treatment notes indicate that Plaintiff reported several mental symptoms during the relevant period, including (at various points) anxiety (Tr. 449, 459, 463); racing thoughts (Tr. 449, 463); grumpiness (Tr. 449); feeling "blah" (Tr. 444); feeling angry (Tr. 894); mood swings (Tr. 899, 924); lack of energy (Tr. 909); appetite disruption (Tr. 439, 459); and sleep disruption (Tr. 434, 444, 439, 904). However, at most of her visits to Dr. Goldman, her mental status examinations were normal, with no aggression; no psychosis; no suicidal ideation; normal appearance; normal behavior; normal activity level; normal speech; normal affect; normal thought processes; normal or fair insight and judgment; normal cognition; and normal impulse control. (Tr. 434-35, 454-55, 459-60, 894-95, 899-900, 904-05, 909-10, 915, 919-20). Moreover, Dr. Goldman often reported that she had a "good response" to medication, often with no side effects. (Tr. 434, 444, 455, 460, 904, 909, 914, 919). Even at visits where she had abnormal findings, those findings were typically described as mild—for example, she was "mildly disheveled" and "slightly jumpy" at one

appointment (Tr. 464); she had a constricted and "mildly grumpy" affect at another appointment (Tr. 450); and her affect was "mildly irritable" at another appointment. (Tr. 445). The ALJ reasonably found these mild or normal examination findings inconsistent with the extreme limitations in Dr. Goldman's opinion. *See Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (the ALJ properly discounted the treating physician's opinions where they were inconsistent with the physician's treating notes, which showed mostly normal mental status examinations).

Plaintiff argues that Dr. Goldman's opinion was consistent with the Global Assessment of Functioning ("GAF") scores of 44 in his treatment notes, which indicate that Plaintiff had serious symptoms.[3] However, as the Commissioner argues, those GAF scores were also inconsistent with the treatment notes showing consistently normal or mild findings. In addition, the Commissioner has noted that "GAF scores have limited importance" in the disability determination process. *Nowling v. Colvin*, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016). *See also Jones v. Astrue*, 619 F.3d 963, 973-74 (8th Cir. 2010) (noting that "the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and [Supplemental Security Income] disability programs" and affirming the ALJ's finding of no disability despite the presence of GAF scores ranging from the mid-40s to the low 50s) (internal quotation marks omitted). The ALJ specifically mentioned Plaintiff's GAF score of 44 but apparently found it was not supported by the rest of the record, and that decision was not unreasonable. (Tr. 57, 59).

---

[3] A GAF score is based on "a clinician's judgment of the individual's overall level of functioning." *Hudson v. Barnhart*, 345 F.3d 661, 662 n.3 (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ("*DSM-IV-TR*"). A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR* 34.

The ALJ's decision to discount Dr. Goldman's opinion was also supported by the opinion of non-examining state agency consultant Dr. Stanley Hutson, who reviewed Plaintiff's medical records and found that they indicated at most moderate limitations in various areas of mental functioning. (Tr. 272-74). The ALJ reasonably determined that the record was more consistent with Dr. Hutson's opinion than with Dr. Goldman's opinion. This decision fell within the "available zone of choice" and will not be disturbed by the Court. *See Hacker*, 459 F.3d at 937-938.

For all of these reasons, the Court finds no error in the ALJ's assessment of Dr. Goldman's opinion.

### C. The RFC Assessment

Plaintiff's next argument is that the RFC assessment is not supported by substantial evidence. A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, RFC "is a medical question." *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Thus, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" *Id.* at 712 (quoting *Lauer v. Apfel*,

245 F.3d 700, 704 (8th Cir. 2001)). An RFC assessment that is "not properly informed and supported by 'some medical evidence' in the record" cannot stand. *Id.*

As a preliminary matter, the Court recognizes that the ALJ's re-evaluation of Dr. Samaritoni's opinions on remand may result in a different RFC finding than the one currently before the Court. That re-evaluation may alter both the physical and mental RFC findings. For example, if the ALJ were to give partial or full weight to Dr. Samaritoni's opinion that Plaintiff's impairments interfere with her attention and concentration and cause her to be off-task 25% or more of the day, that might alter the ALJ's assessment of the mental limitations in Plaintiff's RFC. Thus, the Court need not make a definitive ruling on whether the current RFC is supported by substantial evidence. However, to minimize the possibility of multiple appeals and remands, the Court will briefly address some of Plaintiff's arguments regarding the RFC assessment.

With regard to the mental aspects of the RFC finding, it appears that the record contains substantial evidence to support at least most of the ALJ's findings. As also discussed above, the ALJ did partially discount the opinion of Plaintiff's treating psychiatrist, but he did not entirely disregard it. (Tr. 59). He also included in the RFC several significant mental limitations accounting for some of Dr. Goldman's opinions and for Plaintiff's credible allegations that she does not get along well with people and finds some work "stressful," including a limitation to simple, routine, and repetitive tasks; a work environment free of fast-paced quota requirements; work involving only simple, work-related decisions with few, if any workplace changes; and work involving no interaction with the public and only occasional interaction with coworkers. The mental RFC finding was also supported by the treatment notes of Dr. Goldman, which the ALJ discussed and which showed that although Plaintiff had some mood-related symptoms, her mental status examinations were generally mild or normal. (Tr. 57).

The mental RFC finding is also supported by the opinion of state agency psychological consultant Dr. Stanley Hutson, which the ALJ gave "great weight," finding that it was supported by the record as a whole. (Tr. 59-60). Dr. Hutson reviewed Plaintiff's medical records in October 2014 and found that Plaintiff was moderately limited in several areas: in the ability to understand, remember, and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. He found no significant limitations in several areas: the ability to remember locations and work-like procedures; the ability to understand, remember, and carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to maintain socially appropriate behavior; and the ability to set realistic goals or make plans independently of others. (Tr. 272-74). Dr. Hutson's opinions are consistent with the RFC finding and provide support for it.

With regard to the physical RFC finding, on the other hand, the Court does not find substantial evidence to support the finding that Plaintiff is capable of performing the physical

requirements of light work, with some additional restrictions.[4] The Court first notes that aside from the opinion of Dr. Samaritoni, which was discredited in its entirety by the ALJ, there is no medical opinion evidence in the record regarding Plaintiff's physical ability to function in the workplace. The absence of such medical opinion evidence does not necessarily require remand. The Eighth Circuit has held that in some cases, mild or unremarkable objective medical findings and other evidence may constitute sufficient medical support for an RFC finding, even in the absence of any medical opinion evidence directly addressing the Plaintiff's ability to function in the workplace. *See, e.g.*, *Hensley v. Colvin*, 829 F.3d 926, 929-34 (8th Cir. 2016) (upholding the ALJ's finding that the plaintiff could perform sedentary work despite the absence of specific medical opinion evidence; finding "adequate medical evidence of [the plaintiff's] ability to function in the workplace" where the plaintiff's treating physician found that the plaintiff was in no acute distress and had a normal knee exam and gait; another physician found that his knee assessment was normal and he had "full knee range, good lower limb and spinal flexibility"; and the plaintiff reported greatly reduced or nonexistent knee and back pain after treatment); *Steed v. Astrue,* 524 F.3d 872,

---

[4] Light work is defined in the regulations as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b). The RFC assessment here further limits Plaintiff to standing no more than 4 hours in a workday; performing bilateral foot controls no more than occasionally; never climbing ladders, ropes or scaffolds; never kneeling; and occasionally balancing, stooping, crouching, or crawling.

876 (8th Cir. 2008) (upholding the ALJ's finding that the plaintiff could perform light work based on largely mild or normal objective findings regarding her back condition, despite the fact that the medical evidence was "'silent' with regard to work-related restrictions such as the length of time she [could] sit, stand and walk and the amount of weight she can carry"). *See also Thornhill v. Colvin*, No. 4:12–CV–1150 (CEJ), 2013 WL 3835830, at *12 (E.D. Mo. July 24, 2013) (holding that medical records supporting the ALJ's statement that "physical examinations have been essentially unremarkable and reveal normal independent gait with no evidence of spine or joint abnormality or range of motion limitation or muscle tenderness" constituted medical evidence in support of a finding that the claimant could perform medium work).

Unlike the cases discussed above, however, this case does not involve generally mild or unremarkable objective findings, nor does it contain other medical evidence that addresses Plaintiff's ability to function in the workplace and that tends to support the RFC assessment. Instead, in addition to the opinion of Dr. Samaritoni that Plaintiff has limitations that would preclude light work, the record contains a combination of abnormal and normal findings, and it is not apparent how they support a determination that Plaintiff could perform the standing, sitting, walking, lifting, and carrying requirements of light work. On examination, Plaintiff's treatment providers found that she had tenderness to palpation with 18/18 (or, sometimes, "greater than 12/18") fibromyalgia trigger points positive (Tr. 484, 491, 1004, 1009, 1014, 1017, 1022, 1026, 1038); that even several months after knee surgery, X-rays showed vagus malalignment (Tr. 618) and an MRI showed moderate to advanced patellar chrondromalacia (Tr. 615); that she had tenderness in the spine and the left sacroiliac joints and across the midline (Tr. 497, 696, 1038); and that she walked with a "slightly antalgic gait" or a "slow, nonantalgic gait" and that various tests could be performed only with pain (Tr. 539, 545-46). Plaintiff frequently reported pain in her

back, knees, and all over her body, sometimes telling her treatment providers that it caused her to have trouble doing activities such as walking, bending, climbing stairs, and washing dishes. (Tr. 483, 493, 499, 501, 505, 511-27, 531, 534-35, 538, 545, 589-90, 597-98, 608, 613, 618, 647, 677-78, 685-87, 691, 1002-03, 1008, 1013, 1021, 1037). The doctor who was treating Plaintiff's knee complaints noted that even several months after right knee surgery, she was "having worsening and debilitating pain relating to her pain patellar chrondal disease." (Tr. 614). She has been treated with both conservative and non-conservative means for her fibromyalgia and back and knee pain, including surgery, narcotic medications, non-narcotic medications, and injections. The record also contains several mild or unremarkable findings, such as findings of only mild degenerative changes in the lumbar spine and findings of full range of motion and full strength in her extremities.

The ALJ's very brief discussion of Plaintiff's physical RFC assessment also does not make it clear how the evidence in the record led him to reach the conclusion that Plaintiff was capable of light work. Under Social Security Ruling 96-8p, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Here, the ALJ did not include such a narrative discussion. The ALJ did note some of the negative findings discussed above in his RFC assessment, as does the Commissioner. However, neither the ALJ nor the Commissioner explains how these findings relate to the ability to sit, stand, walk, lift, carry, or perform other work-related activities. It is not apparent to the Court how these findings support an ability to do light work (with some additional restrictions), particularly in light of the many other abnormal findings discussed above, including the finding that she suffered "debilitating pain" by one of her doctors.

For all of the above reasons, the Court finds that the physical RFC finding is not supported by substantial evidence, including some medical evidence, and therefore this case must be remanded for further consideration. *See Hutsell*, 259 F.3d at 712.When the ALJ re-evaluates Dr. Samaritoni's opinion and Plaintiff's RFC on remand, the Court should ensure that the entire RFC assessment is supported by substantial evidence, including "some medical evidence" that addresses Plaintiff's ability to function in in the workplace. The ALJ should also include a narrative discussion explaining how the medical evidence and other evidence provide support for the RFC assessment.

### V.    CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. § 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

_____

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2018.